*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

<u>**ENTRY ORDER**</u>

SUPREME COURT DOCKET NO. 2016-045

JUNE TERM, 2016

| | |
|---|---|
| In re W.B., Juvenile | APPEALED FROM: |
| | Superior Court, Chittenden Unit, Family Division |
| | DOCKET NO. 290-10-13 Cnjv |
| | Trial Judge: Thomas J. Devine |

In the above-entitled cause, the Clerk will enter:

Father appeals an order of the superior court, family division, terminating his parental rights with respect to his son, W.B. We affirm.

The following facts are based on the family court's unchallenged findings. Father, who was sixty-one years old at the time of the termination hearing, has a long history of drug use. He was honorably discharged from the United States Marine Corps in 1987 after serving thirteen years. After his discharge, he began using cocaine, and later heroin. Father met W.B.'s mother in approximately 2004. The two used cocaine together, in addition to alcohol and marijuana. In 2009, both parents were charged with cocaine offenses. Father pled guilty to two counts of possession of cocaine with intent to distribute. He received a probationary sentence, from which he was successfully discharged in January 2014 after engaging in an intensive outpatient program. In about 2010, following a car accident that resulted in permanent nerve damage to his back, father was prescribed methadone and a muscle relaxant for pain. He also uses marijuana for pain management, although not pursuant to medical advice.

The parents were residing together in father's apartment when the mother became pregnant with W.B. Shortly before W.B.'s birth in April 2012, the parents separated and the mother moved into a motel with another man, who physically abused her. The parents worked out a shared custody arrangement in which father took care of W.B. over extended weekends.

The Department for Children and Families (DCF) first became involved with the family in November 2012 when W.B. was about six months old, after mother had moved back in with father. The mother had relapsed with her cocaine use, and DCF had received several reports concerning the parents' lack of care of W.B., including the parents' failure to bring him in for his six-month wellness check. Over the next year, DCF worked with the family, encouraging mother to get back into treatment for her cocaine addiction and working with the Visiting Nurses Association to get the parents to enroll W.B. in child care. Ultimately, DCF made little progress with these goals and in October 2013 DCF filed a petition alleging that W.B. was a child in need of care or supervision (CHINS). After DCF filed the CHINS petition, the family court initially approved a conditional custody order (CCO) allowing W.B. to remain in the parents' custody.

The order required both parents to abstain from alcohol and nonprescription drugs and to keep W.B. away from the mother's abusive boyfriend, with whom she had reunited.

In December 2013, after mother violated the no-contact order, the family court issued a new CCO transferring custody to father. On February 13, 2014, W.B. swallowed half a methadone pill that father had left on top of a safe in father's bedroom. Noticing that W.B. had become groggy, father suspected that the child had eaten the pill, but nonetheless waited between a half hour and an hour before calling 911. By the time the paramedics arrived, the child was nonresponsive. W.B. was taken to the hospital, where he remained in critical condition, receiving treatment for four days. As the result of this incident, the family court issued an order returning custody to DCF, and father was criminally charged with cruelty to a child. He pled guilty to a reduced charge of reckless endangerment and was placed on probation, which included a condition that he refrain from drug or alcohol use. No family members came forward to offer to care for W.B., who was placed in a foster family with whom he has remained ever since.

A disposition hearing was held in March 2014. At the hearing, DCF proposed a plan of reunification with the mother or father within a four-to-six-month time frame. The plan, which was approved by agreement, called for father to: (1) maintain safe and appropriate housing; (2) remain clean and sober; (3) provide appropriate supervision of W.B. at all times; (4) assure that W.B.'s medical, physical, and emotional needs were met on a regular basis; (5) provide urinalysis samples to DCF and other service providers as necessary; (5) sign releases for DCF; (6) engage in a parent support program; (7) attend scheduled visitation with W.B.; and (8) complete an updated drug and alcohol assessment and follow its recommendations.

Father completed a substance assessment that same month. Although father reported that he had last used cocaine in 2009, in fact he had tested positive for cocaine as recently as June 2013. Father acknowledged daily marijuana use and occasional alcohol use, but his testing showed a heavier use of alcohol than reported. The person providing the assessment recommended outpatient treatment, and father began individual counseling.

Following a post-disposition review hearing in May 2014, parent-child contact between father and W.B. was expanded, with the court directing DCF to explore additional visitation at father's home. In June 2014, a fire destroyed the apartment building in which father lived, and it was another nine months before father found stable housing. DCF proposed a new case plan that called for reunification within three months or adoption. The parents objected to the case plan. In November 2014, father suffered a medical condition that required his hospitalization for several weeks.

In January 2015, DCF proposed adoption as the sole case plan goal and filed petitions to terminate both father's and the mother's parental rights. The termination hearing was held over two days in October and December 2015. Mother voluntarily relinquished her parental rights during the first day of the hearing.

Following the hearing, the family court terminated father's parental rights, concluding that his parenting ability had stagnated and that termination of his parental rights was in W.B.'s best interest. Regarding stagnation, the court noted that nearly two years after the initial disposition plan called for reunification within four to six months, father was still struggling with his sobriety and had ceased working with his counselor. The court further noted that father had been warned about the potential dangers of using alcohol and marijuana in conjunction with

methadone, but that he continued to do so and had not been candid with DCF about the extent of his alcohol and marijuana use. The court stated that father's lack of candor regarding the extent of his drug use puts the success of his case plan in jeopardy.

As far as W.B.'s best interests, the family court acknowledged that W.B. and father have a close relationship and that father had engaged in regular visitation during which he had shown obvious signs of love and affection toward the child. The court also found that W.B. had a close and loving bond with his foster mother and her family, and that W.B. had spent half his life in her care. He had made strong adjustment to his foster home, fully integrating into his household.

With respect to father's ability to resume parental duties within a reasonable time, the court found that father had demonstrated an ability to care for W.B. for limited periods of time. But father had not been involved with W.B.'s medical appointments, and had temporarily lost the child's benefits from a state nutritional program when he was made responsible for maintaining those benefits. The court was most concerned with the extent of father's continued drug use, noting again that marijuana and alcohol used in combination with father's prescription medications was a serious concern, particularly given ongoing issues regarding father's ability to ensure W.B.'s safety. The court observed that even after his past carelessness with his methadone pills, which resulted in dire consequences for W.B., father continued to leave his pills in the open and also continued to have knives displayed in his apartment despite being told that some of them were within W.B.'s reach. Noting that DCF had worked with the family for a year before filing the petition in court, and two more years have passed, and father is still "at the beginning" in terms of sobriety, the court concluded that W.B. needs permanency.

Finally, the court's assessment of the fourth factor—whether the parent has played and continues to play a constructive role—was mixed. On the one hand, father has consistently demonstrated love and affection and emotional support for the child. On the other hand, he has exposed the child to danger due to his substance abuse, which has been destructive.

In light of its analysis of the relevant factors, the court concluded that W.B.'s best interest would be served by terminating father's parental rights without limitation as to adoption.

On appeal, father argues that the family court placed an inordinate emphasis on the third statutory best-interests factor—whether he would be able to resume parental duties within a reasonable period of time—which he insists is not the most critical factor in a situation such as this, where the parent plays a positive role in the child's life. See In re J.M., 2015 VT 94, ¶ 14 (stating that parent's ability to resume parental duties has been identified as most important of statutory best-interest factors, "but not to the exclusion of the remaining statutory criteria" (emphasis in original)). Father contends that whatever question there is concerning his ability to be a custodial parent, his parenting skills as a noncustodial parent have been very good.

We do not find this argument persuasive. We agree that in certain situations the other best-interest factors may override the reasonable-period-of-time factor. See In re J.F., 2006 VT 45, ¶ 13, 180 Vt. 583 (mem.) (stating that "in some cases a loving parental bond will override other factors in determining whether termination of parental rights is the appropriate remedy"). Whether a parent will be able to resume parental duties within a reasonable period of time from the perspective of the child is not dispositive, but remains the most critical of the four factors. In re J.M. does not suggest otherwise. Here, the family court did not ignore the other statutory factors, but rather considered them in conjunction with the most critical factor and the circumstances of this case. In doing so, the court acknowledged and credited father for having a

loving, if limited, relationship with W.B. Notwithstanding his attributes as a noncustodial parent, however, the court concluded that father could not keep W.B. safe on a regular basis because of his ongoing drug use and his likely related laxness toward potential dangers. Further, the court concluded that W.B. needs permanency and cannot wait any longer for father to reach the point where he can parent the child safely. The court's findings, and the evidence upon which they are based, support these conclusions. In re J.M., 2015 VT 94, ¶ 8 (stating that our role in reviewing termination decision "is not to second-guess the family court or to reweigh the evidence," but rather to uphold findings that are not clearly erroneous and conclusions that are reasonably supported by those findings and "to determine whether the court abused its discretion in terminating . . . parental rights" (quotation omitted)).

Affirmed.


BY THE COURT:


_____
John A. Dooley, Associate Justice


_____
Marilyn S. Skoglund, Associate Justice


_____
Beth Robinson, Associate Justice